**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

**PATRIOT COAL CORPORATION,** *et al.*,

Debtors.[1]

Chapter 11

Case No. 12-12900 (SCC)

(Jointly Administered)

### FINAL ORDER (I) AUTHORIZING DEBTORS (A) TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e), AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 AND (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED LENDERS PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364

Upon the motion (the "**Motion**"), dated July 9, 2012, of Patriot Coal Corporation (the "**Borrower**") and its affiliated debtors, each as debtor and debtor-in-possession (collectively, the "**Debtors**"), in the above-captioned cases (the "**Cases**") pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and the Local Bankruptcy Rules for the Southern District of New York, including Rule 4001-2 (the "**SDNY Local Rules**"), seeking, among other things:

(1)     authorization for the Borrower to obtain post-petition financing (the "**Financing**"), and for all of the other Debtors (the

---

[1] The Debtors are the entities listed on Schedule 1 attached to the Motion. The employer tax identification numbers and addresses for each of the Debtors are set forth in the Debtors' chapter 11 petitions.

"**Guarantors**") to guaranty the Borrower's obligations in connection with the Financing, up to the aggregate principal amount of $802,000,000 (the actual available principal amount at any time being subject to those conditions set forth in the DIP Documents (as defined below)), consisting of (a) revolving credit loans in an amount not to exceed $125,000,000 ("**Revolving Credit Loan**"), (b) a term loan in the amount of $375,000,000 ("**Term Loan**", and together with the Revolving Credit Loan, the "**First Out Facility**"), and (c) a roll up (the "**L/C Roll Up**") of obligations under the Pre-Petition Credit Agreement (as defined below) in respect of outstanding letters of credit, inclusive of any obligations as to reimbursement, renewal and extension of same (the "**Roll Up Letters of Credit**") issued in the aggregate amount of approximately $302,000,000 as of the Petition Date ("**Second Out Facility**") from (i) Citibank, N.A., as (x) Administrative Agent (as defined in the First Out DIP Credit Agreement (as defined below)) for itself and the other Revolving Lenders and Term Lenders (each as defined in the First Out DIP Credit Agreement), and (y) as Revolving Agent and as First Out Term Agent (each as defined in the Security Agreement (as defined below)) and in all of the foregoing capacities as the "**First Out DIP Agent**") for the Revolving Lenders, Term Lenders, and the L/C Issuers (as defined in the First Out DIP Credit Agreement and, for purposes of this Order, the "**First Out L/C Issuers**") (the foregoing parties collectively constituting the

2

"**First Out DIP Lenders**") and (ii) Bank of America, N.A., as Administrative Agent and Collateral Agent (the "**Second Out DIP Agent**") for itself and the other Second Out DIP Lenders and Rolled Up L/C Issuers (as defined below) under the DIP Credit Agreement (as defined below) (the "**Second Out DIP Lenders**", together with the First Out DIP Lenders, the "**DIP Lenders**"), and the "**Second Out DIP Agent**", together with the First Out DIP Agent, the "**DIP Agents**"), all to be arranged by Citigroup Global Markets Inc., Barclays Bank PLC, and Merrill Lynch, Pierce, Fenner & Smith Incorporated (the "**Joint Lead Arrangers**");

(2)    authorization for the Debtors to execute and enter into the DIP Documents (as defined below) and to perform such other and further acts as may be required in connection with the DIP Documents;

(3)    authorization for the Debtors to grant security interests, liens, superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code and liens pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code), and related protections to the DIP Lenders to secure all DIP Obligations (as defined below), in accordance with the provisions of this Order and as set forth in that certain Pledge, Security, and Intercreditor Agreement, dated as of July 9, 2012, by and between the Borrower, the Revolving Agent, the

First Out DIP Agent, and the Second Out DIP Agent (the "**Security Agreement**"), annexed hereto as Exhibit A;

(4)    authorization for the Debtors, simultaneously with the initial draw under the Financing, to immediately use proceeds of the Financing to: (a) repay in full in cash their obligations in respect of the Outstanding Swing Line Loan under the Pre-Petition Credit Agreement (as defined below); and (b) collateralize the Securitization Letters of Credit (as defined below) by issuing standby letters of credit under the Revolving Credit Loan (as defined below) or otherwise provide for such Securitization Letters of Credit in a manner satisfactory to the applicable issuing bank;

(5)    that the Court deem the Debtors' obligations in respect of Roll Up Letters of Credit, Secured Cash Management Agreements (as defined in the Pre-Petition Credit Agreement) and Secured Hedge Agreements (as defined in the Pre-Petition Credit Agreement) to have been incurred under the applicable DIP Documents;

(6)    the granting of adequate protection to the Pre-Petition Credit Agreement Lenders (as defined below);

(7)    approval of certain stipulations by the Debtors with respect to the Pre-Petition Financing Agreements (as defined below) and the liens and security interests arising with respect thereto;

(8)     authorization for the Debtors to use Cash Collateral (as defined below) in which the Pre-Petition Credit Agreement Lenders have an interest, and the granting of adequate protection to the Pre-Petition Credit Agreement Lenders with respect to, *inter alia*, such use of their Cash Collateral;

(9)     subject only to and effective upon entry of this final order granting the foregoing relief and such other relief as provided herein and in such final order (this "**Final Order**") the limitation of the Debtors' right to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code;

(10)     pursuant to Bankruptcy Rule 4001, that an interim hearing (the "**Interim Hearing**") on the Motion be held before this Court to consider entry of the proposed interim order annexed to the Motion (the "**Interim Order**") (a) authorizing the Borrower, on an interim basis, to forthwith borrow or obtain and/or maintain (as applicable) letters of credit from the DIP Lenders under the DIP Documents, up to an aggregate principal or face amount not to exceed (i) $125,000,000 under the Revolving Credit Loan, (ii) $250,000,000 under the Term Loan and (iii) $302,000,000 under the Second Out Facility, each such borrowing subject to any limitations under the DIP Documents, to (x) refinance the Pre-Petition Debt as set forth herein, (y) provide operating cash for the Debtors, and (z) provide working capital to the Debtors and the

5

Guarantors (including payment of fees and expenses in connection with the transactions contemplated by the DIP Documents), (b) authorizing the Debtors' use of Cash Collateral and all other collateral, and (c) granting the adequate protection described herein; and

(11)   that this Court schedule a final hearing (the "**Final Hearing**") to be held no later than thirty (30) days from the date of the entry of the Interim Order to consider entry of this Final Order authorizing the balance of the borrowings and letter of credit issuances under the DIP Documents on a final basis, as set forth in the Motion and the DIP Documents.

The Interim Hearing having been held by this Court on July 10, 2012, and this Court having entered the Interim Order on July 11, 2012.

Due and appropriate notice of the Motion, the interim and final relief requested therein, the Interim Order, and the Final Hearing having been served by the Debtors on (a) the Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**"); (b) those creditors holding the fifteen (15) largest secured claims against the Debtors' estates on a consolidated basis; (c) those creditors holding the fifty (50) largest unsecured claims against the Debtors' estates on a consolidated basis; (d) each of the DIP Agents and their attorneys; (e) the Pre-Petition Agent and its attorneys; (f) the Pre-Petition Securitization Administrator (as defined below); (g) each of the L/C Issuers under the Pre-Petition Credit Agreement (as defined therein); (h) the Pre-Petition Secured Lenders (as defined below); (i) the Internal Revenue Service; (j) all

6

lessors under the Real Property Leases (as defined in the First Out DIP Credit Agreement); (k) the Securities and Exchange Commission; (l) the United States Attorney's Office for the Southern District of New York; (m) the United States Environmental Protection Agency; and, with respect to the Final Hearing only, (n) counsel to the statutory committee of unsecured creditors appointed in these Cases (the "**Creditors' Committee**") and (o) those parties who have requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**").

No formal objections to the Motion or this Final Order having been filed, and the Final Hearing having been held by this Court on August 2, 2012.

Upon the record made by the Debtors at the Interim Hearing and at the Final Hearing and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    *Disposition*.  The Motion is granted in accordance with the terms of this Final Order.  Any informal objections to the Motion with respect to the entry of this Final Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.

2.    *Jurisdiction*.  This Court has core jurisdiction over the Cases, this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.

3.    *Notice*.  Notice of the Motion, the relief requested therein, the Interim Hearing, the Interim Order, and the Final Hearing was served by the Debtors on the Notice Parties as described herein.  Under the circumstances, the notice given by the

Debtors of the Motion, the relief requested therein, the Interim Hearing, the Interim Order, and the Final Hearing constitutes appropriate, due and sufficient notice thereof, and complies with Bankruptcy Rules 4001(b) and (c) and the SDNY Local Rules.  No further notice of the relief sought at the Final Hearing and the relief granted herein is necessary or required.

4.     *Debtors' Stipulations*.  Without prejudice to the rights of any other party (but which rights are subject to the limitations thereon contained in Paragraphs 19 and 20 hereof), the Debtors admit, stipulate and agree that:

(a)     *Pre-Petition Debt*.  As of the filing of the Debtors' chapter 11 petitions (the "**Petition Date**"), the Borrower was indebted and liable, without defense, counterclaim or offset of any kind: (i) to the lenders under that certain Amended and Restated Credit Agreement, dated as of May 5, 2010 (as heretofore amended, supplemented or otherwise modified, the "**Pre-Petition Credit Agreement**"), among the Borrower, the lenders and issuers of letters of credit (the "**Pre-Petition Credit Agreement Lenders**"), Bank of America, N.A., as administrative agent for the Pre-Petition Credit Agreement Lenders (in such capacity, the "**Pre-Petition Agent**"), in the aggregate principal amount of approximately $25,000,000 in respect of outstanding Swing Line Loans (the "**Outstanding Swing Line Loans**"), and approximately $300,760,433.55 million in respect of Roll Up Letters of Credit, and (ii) to the lenders under that certain Receivables Purchase Agreement, dated as of March 2, 2010 (as heretofore amended, supplemented or otherwise modified, the "**Pre-Petition Securitization Facility**") between the Borrower, the lenders from time to time party

8

thereto (the "**Pre-Petition Securitization Lenders**"), and Fifth Third Bank as

Administrator and LC Bank (in such capacities the "**Pre-Petition Securitization**

**Administrator**"), in the aggregate principal amount of approximately $51,804,289 in

respect of outstanding letters of credit (the "**Securitization Letters of Credit**"), in each

case, pursuant to, and in accordance with the terms of, the Pre-Petition Credit Agreement

or Pre-Petition Securitization Facility (such agreements, together with the mortgages and

all other documentation executed in connection therewith (including, for the avoidance of

doubt, any Secured Hedge Agreements and Secured Cash Management Agreements

(each as defined in the Pre-Petition Credit Agreement)), collectively, the "**Pre-Petition**

**Agreements**"), plus, in each case, interest thereon and fees, expenses (including any

attorneys', accountants', appraisers', and financial advisors' fees that are chargeable or

reimbursable under the Pre-Petition Agreements), charges and other obligations incurred

in connection therewith as provided in the Pre-Petition Agreements (collectively, the

"**Pre-Petition Debt**"), (x) the Pre-Petition Debt constitutes the legal, valid, and binding

obligation of the Debtors, enforceable in accordance with the terms of the Pre-Petition

Agreements (other than in respect of the stay of enforcement arising from section 362 of

the Bankruptcy Code), (y) no portion of the Pre-Petition Debt is subject to avoidance,

recharacterization, recovery or subordination pursuant to the Bankruptcy Code or

applicable nonbankruptcy law, and (z) the Debtors do not have any claims,

counterclaims, causes of action, defenses, or setoff rights, whether arising under the

Bankruptcy Code or otherwise, against (i) the Pre-Petition Credit Agreement Lenders, or

(ii) the Pre-Petition Securitization Lenders ((i) and (ii) collectively, the "**Pre-Petition**

**Secured Lenders**"), the Pre-Petition Agent, the Pre-Petition Securitization Administrator or their respective affiliates, agents, officers, directors, employees, and attorneys;

(b)    *Pre-Petition Liens*.   The liens and security interests granted to the Pre-Petition Agent and the Pre-Petition Securitization Administrator pursuant to and in connection with the Pre-Petition Financing Agreements (including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the Pre-Petition Agent or the Pre-Petition Securitization Administrator, for their respective benefits and for the benefit of the respective Pre-Petition Secured Lenders) (the "**Pre-Petition Liens**") are (i) valid, binding, perfected, enforceable, first-priority liens and security interests in the personal and real property described in the Pre-Petition Financing Agreements (the "**Pre-Petition Collateral**"), and (ii) not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law;

(c)    the aggregate value of the Pre-Petition Collateral substantially exceeds the aggregate amount of the Pre-Petition Debt; and

(d)    the Commitment Letter (as defined below) expired by its own terms prior to the Petition Date; and the Debtors are not aware of any valid claims or causes of action, whether arising under the Bankruptcy Code or otherwise, against the Pre-Petition Joint Lead Arrangers (as defined below) arising out of or relating to the Commitment Letter.

5.    *Findings Regarding the Financing.*

(a)    Good cause has been shown for the entry of this Final Order.

(b)    The Debtors need to obtain the full amount of the Financing and use Cash Collateral in order to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers, and customers, to make payroll, to make capital expenditures, to refinance certain Pre-Petition Debt, and to satisfy other working capital and operational needs.  The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral, incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

(c)    The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders pursuant to the DIP Documents (as defined below) and are unable to obtain adequate unsecured credit allowable pursuant to section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable pursuant to sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code without the Debtors (i) granting to the DIP Agents and the DIP Lenders, subject to the Carve Out as provided for herein, the DIP Liens and the Superpriority Claims (each as defined below) under the terms and conditions set forth in this Final Order and in the DIP Documents, as well as any and all other protections provided for herein and therein, (ii) refinancing the Pre-Petition Debt as described herein upon entry of this Final Order, such refinancing being a requirement by the DIP Agents for the Financing, and (iii) obtaining entry of an order of this Court providing that the Superpriority Claims, DIP Liens and any and all other protections set forth in this Final

11

Order and in the DIP Documents will not be affected by any subsequent reversal or modification of this Final Order, as provided in section 364(e) of the Bankruptcy Code.

(d)      The terms of the Financing and the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.  The Debtors have further established that consummation of the Financing and the use of Cash Collateral in accordance with the provisions of this Final Order and the DIP Documents (as defined below) are in the best interests of the Debtors' estates consistent with their fiduciary duties.

(e)      The Financing has been negotiated in good faith and at arm's length among the Debtors, the DIP Agents, the Pre-Petition Agent, the Joint Lead Arrangers, and the DIP Lenders, and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the Financing and the DIP Documents, including without limitation, (i) all loans made to, and all letters of credit issued for the account of, the Debtors pursuant to the Superpriority Secured Debtor-in-Possession Revolving and Term Loan Credit Agreement attached as Exhibit A to the Motion (as may be amended from time to time, including pursuant to the provisions of this Final Order, the "**First Out DIP Credit Agreement**") and the Amended and Restated Super Priority Secured Debtor-in-Possession Credit Agreement attached as Exhibit B to the Motion (as may be amended from time to time, including pursuant to the provisions of this Final Order, the "**Second Out DIP Credit Agreement**" and, together with the First Out DIP Credit Agreement, the "**DIP Credit Agreements**"), and (ii) any "**Obligations**" (as

12

defined in the DIP Credit Agreements) of the Debtors, in each case owing to either the

DIP Agent, any L/C Issuer under either DIP Agreement (each a "**DIP L/C Issuer**" and,

collectively, the "**DIP L/C Issuers**"), any DIP Lender or any their respective affiliates, in

accordance with the terms of the DIP Documents (all of the foregoing in clauses (i) and

(ii) collectively, the "**DIP Obligations**"), shall be deemed to have been extended by the

DIP Agents, the DIP L/C Issuers and the DIP Lenders and their affiliates in good faith, as

that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon

the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agents,

the L/C Issuers, and the DIP Lenders (and the successors and assigns of each) shall be

entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that

this Final Order or any provision hereof is vacated, reversed, or modified, on appeal or

otherwise.

6.     *Authorization of the Financing, the DIP Documents, and the Refinancing*
*of Pre-Petition Debt.*

(a)     The Debtors were, by the Interim Order, and hereby are authorized

to execute and enter into the DIP Documents, including the DIP Credit Agreements, and

the DIP Documents are hereby approved.  The Borrower was, by the Interim Order, and

hereby is authorized to borrow money and obtain letters of credit pursuant to the DIP

Credit Agreements, and the Guarantors were, by the Interim Order, and hereby are

authorized to guarantee such borrowings and the Borrower's obligations with respect to

such letters of credit, up to an aggregate principal or face amount of $802,000,000 (which

amounts are inclusive of any the borrowings authorized pursuant to the Interim Order,

plus interest, fees and other expenses and amounts provided for in the DIP Documents),

consisting of borrowings of up to an aggregate principal or face amount of $125,000,000

under the Revolving Credit Loan, $375,000,000 under the Term Loan, and up to

$302,000,000 under the Second Out Facility, in accordance with the terms of this Final

Order and the DIP Documents, which borrowings shall be used for the purposes

permitted under the DIP Credit Agreements, including, without limitation, to refinance

the Pre-Petition Debt as provided herein, to provide working capital for the Borrower and

the Guarantors and to pay interest, fees and expenses in accordance with this Final Order

and the DIP Documents.  In addition to such loans and obligations, the Debtors were, by

the Interim Order, and hereby are authorized to incur and pay in cash Obligations under

Secured Cash Management Agreements and Obligations arising under Secured Hedge

Agreements and the Credit Card Agreement (as defined below) (in each case whether

incurred before or after the Petition Date) subject to the terms and limitations set forth in

the First Out DIP Credit Agreement or Second Out DIP Credit Agreement, as applicable;

*provided, however*, that nothing herein shall require the DIP Agents or any other party to

provide any such services or functions to the Debtors.

       (b)      Each Secured Hedge Agreement under the Pre-Petition Credit

Agreement to which a Revolving Lender is a party was deemed, by the Interim Order,

and hereby is deemed to be a Secured Hedge Agreement under the Revolving Facility,

and the obligations arising thereunder shall (i) be paid in cash as and when due and (ii) up

to an aggregate amount not to exceed $10,000,000 at any time, be secured by the

Revolving Collateral and constitute Superpriority Claims (as defined below) equal in

14

priority to the Superpriority Claims of the Revolving Lenders, and (iii) with respect to obligations in excess of $10,000,000, constitute unsecured claims.  All other Secured Hedge Agreements under the Pre-Petition Credit Agreement was deemed, by the Interim Order, and hereby shall be deemed Secured Hedge Agreements under the Second Out DIP Agreement, and all obligations arising thereunder shall (i) be paid in cash as and when due, and (ii) be secured by the Collateral securing the Obligations under the Second Out DIP Credit Agreement as provided in Paragraph 8 of this Final Order and the Security Agreement, and constitute Superpriority Claims equal in priority to the Superpriority Claims of other Second Out DIP Lenders.

(c)     In connection with the refinancing of certain of the Pre-Petition Debt, following the entry of the Interim Order and as part of the initial borrowing under the Financing, the Debtors used a portion of the proceeds from the Financing in accordance with the DIP Documents and the Interim Order to pay in cash to each of the Pre-Petition Agent and the Pre-Petition Securitization Administrator on account of all accrued and unpaid principal, interest, and fees on the Outstanding Swing Line Loan and the letter of credit fees on the Securitization Letters of Credit, each at the non-default rates provided for in the applicable Pre-Petition Financing Agreement, and all other accrued and unpaid fees and disbursements (including, but not limited to, fees owed to the Pre-Petition Agent and the Pre-Petition Securitization Administrator) owing to the Pre-Petition Agent and the Pre-Petition Securitization Administrator under the Pre-Petition Financing Agreements and incurred prior to the Petition Date, and such payments are hereby approved on a final basis.

15

(d)     Each of the Pre-Petition Credit Agreement Lenders has purchased for the benefit of each L/C Issuer (as defined in the Pre-Petition Credit Agreement and, here, a "**Rolled Up L/C Issuer**") an irrevocable and unconditional participation in the Roll Up Letters of Credit, each of which was issued for a term that extends automatically for successive one year terms unless notice of non-extension is given by the applicable Rolled Up L/C Issuer.  Upon entry of this Final Order and approval by the Required Lenders (as defined in the Pre-Petition Credit Agreement): (i) the Pre-Petition Credit Agreement shall be deemed amended and restated in its entirety and replaced by the Second Out DIP Credit Agreement; (ii) all Roll Up Letters of Credit under the Pre-Petition Credit Agreement shall be deemed to have been issued and outstanding pursuant to the Second Out DIP Credit Agreement and shall constitute "Second Out Letters of Credit"; (iii) each Rolled Up L/C Issuer under the Pre-Petition Credit Agreement shall be deemed an "L/C Issuer" under, and as defined in, the Second Out DIP Credit Agreement and shall have all of the rights and obligations set forth therein; (iv) each Pre-Petition Credit Agreement Lender shall be deemed a Second Out DIP Lender under the Second Out Facility and shall have all rights and obligations thereof as set forth in the Second Out DIP Credit Agreement and shall be bound by the terms of the Security Agreement; and (v) without limiting the foregoing, all obligations of the Pre-Petition Credit Agreement Lenders with respect to Roll Up Letters of Credit, including, but not limited to, obligations (whether arising prior to or subsequent to the Petition Date) with respect to L/C Advances (as defined in the Pre-Petition Credit Agreement), reimbursement, renewal

and extension of the Roll Up Letters of Credit, shall remain in full force and effect, as set forth in the Second Out DIP Credit Agreement.

(e)    That certain Amended and Restated Citibank One Card Agreement by and between the Borrower and Citibank, N.A., dated as of July 9, 2012 (the "**Credit Card Agreement**") was, by the Interim Order, and hereby is approved and the Debtors are authorized to perform thereunder, regardless of whether any obligations arising thereunder were incurred by the Debtors prior to or subsequent to the Petition Date.

(f)    In furtherance of the foregoing and without further approval of this Court, each Debtor was, by the Interim Order, and hereby is authorized and directed to perform all acts, to make, execute, and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages, and financing statements), and to pay all fees that may be reasonably required or necessary for the Debtors' performance of their obligations under the Financing (as provided for in the DIP Documents (as defined below); *provided, however,* that the fees payable to the Second Out DIP Agent under the DIP Documents are hereby reduced by $751,901.08, which amount shall be repaid by the Second Out DIP Agent to the Debtors upon entry of this Final Order), including, without limitation:

(i)    the execution, delivery, and performance of the DIP Credit Agreements, the other Loan Documents (as defined in the DIP Credit Agreements) and any exhibits attached thereto, including, without limitation, the Security Agreement, all related documents and any mortgages contemplated thereby and the Letter Agreements (as defined below) (collectively, the "**DIP Documents**"),

17

(ii)     the execution, delivery, and performance of one or more amendments to or waivers of the requirements of the DIP Documents, including the DIP Credit Agreements for, among other things, the purpose of adding additional financial institutions as DIP Lenders and reallocating the commitments for the Financing among the DIP Lenders, in each case in such form as the Debtors, the applicable DIP Agent, and the applicable DIP Lenders may agree (it being (A) understood that no further approval of the Court shall be required for non-material amendments to the DIP Credit Agreements (and any fees paid in connection therewith) that do not shorten the maturity of the extensions of credit thereunder or increase the commitments, the rate of interest or the letter of credit fees payable thereunder, and (B) agree that, to the extent practicable, the Debtors shall provide prior written notice of any such non-material amendments to the Creditors' Committee and, in any event, provide the Creditors' Committee with notice of such non-material amendments and any fees related thereto within two business (2) days of their execution).  Notwithstanding any other provision hereof, without further approval of this Court but subject to prior notice to the Creditors' Committee, amendments to the DIP Documents may be made at any time on or prior to the 120th day after the Closing Date (as defined in the DIP Credit Agreements), as contemplated by the separate letter agreements entered into in connection with the Financing (as in effect on the date hereof, the "**Letter Agreements**"), including, without limitation, any amendment that is determined to be (1) reasonably necessary or advisable to facilitate a "successful syndication," as contemplated by such separate letter agreements, (2) required because a "successful syndication" is not likely to be achieved by such date, with any such

18

amendment (including, without limitation, an increase in the rate of interest, with such increase not to exceed the amounts authorized by the Letter Agreements) being deemed effective as of the Closing Date, or (3) ministerial in nature;

(iii)     the non-refundable payment to the DIP Agents, the Joint Lead Arrangers and the DIP Lenders, as the case may be, of the fees and any amounts due in respect of indemnification obligations payable under the DIP Documents and reasonable costs and expenses as may be due thereunder from time to time, including, without limitation, fees and expenses of the professionals and industry consultants retained by the DIP Agents as provided for in the DIP Documents, without the need to file retention motions or fee applications, within 10 days after invoices therefor (the "**Invoiced Fees**") are received by the Debtors, with copies to be delivered simultaneously to the U.S. Trustee and counsel to the Creditors' Committee (the "**Review Period**"), which Invoiced Fees shall be sufficiently detailed to enable a determination as to the reasonableness thereof (without limiting the right of the various professionals as appropriate to exclude information that such professionals believe in good faith to be protected by the attorney-client privilege, the attorney work product doctrine or other privilege); *provided* that (a) the Debtors, the Creditors' Committee and the United States Trustee shall have the right to dispute the payment of any portion of the Invoiced Fees by delivering to the DIP Agent prior to the expiration of the Review Period a written notice identifying the portion of the Invoiced Fees that is disputed by such party (the "**Disputed Fees**") with a reasonably detailed description of the basis for the dispute; (b) after the expiration of the Review Period, the Debtors shall pay all Invoiced Fees other than any

portion constituting Disputed Fees; and (c) any dispute with respect to Disputed Fees that the parties are unable to resolve on a consensual basis may be heard by the Court on a motion filed in accordance with the Case Management Order entered in these cases; and

(iv)    the performance of all other acts required under or in connection with the DIP Documents.

(g)    Upon execution and delivery of the DIP Documents, as per the provisions of the Interim Order, the DIP Documents constitute, and by the provisions of this Final Order shall constitute, valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with the terms of the DIP Documents and this Final Order.  No obligation, payment, transfer, or grant of security under the DIP Documents or this Final Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment or counterclaim; *provided*, *however*, that, solely in the event that there is a timely successful challenge, pursuant and subject to the limitations contained in Paragraphs 19 and 20 of this Final Order, to the validity, enforceability, extent, perfection or priority of the Pre-Petition Debt or a determination that the Pre-Petition Debt was undersecured as of the Petition Date, the Court reserves the right to unwind or otherwise modify, after notice and hearing, any portion of the Pre-Petition Debt refinanced or rolled up hereunder (which might include the disgorgement or re-allocation of interest, fees, principal, or other incremental consideration paid in respect of the Pre-Petition Debt or the avoidance of liens and/or guarantees with respect to one or more of the Debtors solely

to the extent that the Court finds that, in light of such timely, successful challenge, the refinancing unduly advantaged the applicable Pre-Petition Secured Lenders; *provided, however*, that if any payment of any Pre-Petition Debt (including, without limitation, the payment of the Outstanding Swing Line Loan pursuant to the terms of this Final Order) is subsequently rescinded, avoided, disgorged or otherwise clawed back, such payments shall be immediately paid to the First Out DIP Agent for the benefit of the First Out DIP Lenders until such time as all F/O DIP Obligations (as defined below) are indefeasibly repaid in full in cash.

7.      *Superpriority Claims.*

(a)      Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed claims against the Debtors (without the need to file any proof of claim) with priority over any and all administrative expenses, diminution claims (including any Adequate Protection Obligations (as defined below)), and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code (the "**Superpriority Claims**"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof, subject only to the payment of the Carve Out to the extent

21

specifically provided for herein.    The Superpriority Claims granted hereunder to the Revolving Lenders shall be *pari passu* with the Superpriority Claims granted hereunder to the Term Lenders.    Subject to the provisions of Paragraph 18 of this Order, the Superpriority Claims granted hereunder to the Second Out DIP Lenders shall be immediately junior in priority and subject to the Superpriority Claims of the Revolving Lenders and the Term Lenders.

        (b)    *Carve Out*.  For purposes hereof, the "**Carve Out**" means (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee pursuant to section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United States Code, (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not exceeding $200,000, and (iii) any and all allowed and unpaid claims of any professional of the Debtors or Creditors' Committee whose retention is approved by the Bankruptcy Court during the Cases pursuant to sections 327 and 1103 of the Bankruptcy Code for unpaid fees and expenses (and the reimbursement of out-of-pocket expenses allowed by the Bankruptcy Court incurred by any members of the Creditors' Committee (but excluding fees and expenses of third party professionals employed by such Creditors' Committee members)) incurred, subject to the terms of this Final Order, (A) prior to the occurrence of an Event of Default (as defined in the DIP Credit Agreement) and (B) at any time after the occurrence and during the continuance of an Event of Default in an aggregate amount not exceeding $7,000,000 relating to amounts in this subclause (B); *provided*, *however*, (x) that nothing herein shall be construed to impair the ability of any party to object to any of

22

the fees, expenses, reimbursement or compensation described in clauses (A) and (B) above, and (y) that cash or other amounts on deposit in the L/C Cash Collateral Account (as defined in the First Out DIP Credit Agreement) shall not be subject to the Carve Out.

8.      *DIP Liens*.  As security for the DIP Obligations, effective and perfected upon the date of the Interim Order and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agents of, or over, the "**Collateral**" (as defined in the Security Agreement) and the proceeds, product, offspring or profits of same, the following security interests and liens are hereby granted as set forth below, subject only in the event of the occurrence and during the continuance of an Event of Default to the payment of the Carve Out (all such liens and security interests granted to the DIP Agents, for its benefit and for the benefit of the DIP Lenders, pursuant to this Final Order and the DIP Documents, the "**DIP Liens**").  All capitalized terms used but not otherwise expressly defined or referenced to another DIP Document in this Paragraph 8 shall have the meanings ascribed to them in the Security Agreement.

(a)      DIP Liens Granted to Revolving Agent for the Benefit of Revolving Lenders.  Pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, the Revolving Agent for the benefit of the Revolving Lenders is hereby granted (i) a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon the Revolving Collateral and all proceeds, product, offspring, or profits of same, and (ii) a valid, binding, continuing, enforceable, fully-perfected first

23

priority security interest in and lien upon the Term Collateral and all proceeds, product, offspring, or profits of same.

(b)      <u>DIP Liens Granted to the First Out Term Agent and Second Out DIP Agent for the Benefit of the Term Lenders and Second Out DIP Lenders</u>.  Pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, the Term Agent, for the benefit of the Term Lenders, and the Second Out DIP Agent, for the benefit of the Second Out DIP Lenders, and subject to the Security Agreement, each are hereby granted (i) a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon the Term Collateral and all proceeds, product, offspring, or profits of same, and (ii) a valid, binding, continuing, enforceable, fully-perfected second priority security interest in and lien upon the Revolving Collateral and all proceeds, product, offspring, or profits of same.

(c)      <u>Application of Proceeds of DIP Liens</u>.  Notwithstanding the DIP Lien priority described in Paragraph 8(b) of this Final Order, all proceeds of Collateral shall be applied to the Obligations and paid to the DIP Lenders in accordance with the waterfall provisions set forth in Section 10.09 of the Security Agreement.  Further, for the avoidance of doubt, to the extent not expressly set forth herein, all rights, priorities, remedies, and obligations as between the First Out DIP Agent and the Second Out DIP Agent and each of their respective DIP Lenders shall be governed by the express terms of the Security Agreement, which is approved in its entirety by this Final Order.

(d)      <u>Excluded Avoidance Actions</u>.  The DIP Liens shall not attach to the Debtors' claims and causes of action pursuant to sections 502(d), 544, 545, 547, 548,

24

549, and 550 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code (collectively, "**Excluded Avoidance Action Claims**"), but, subject only to and effective upon entry of this Final Order, shall attach to any proceeds or property recovered whether by judgment, settlement or otherwise ("**Avoidance Proceeds**"). For the avoidance of doubt, other than as specifically provided for in Paragraph 18 of this Order, the Superpriority Claims are payable from and have recourse to the Avoidance Proceeds of the Excluded Avoidance Action Claims.

(e)    <u>Liens Junior to the DIP Liens</u>. Pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Lenders are hereby granted a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all pre- and post-petition property of the Debtors (other than the property described in clause (a) or (b) of this Paragraph 8, as to which the liens and security interests in favor of the DIP Agents will be as described in such clauses) that is subject to valid, perfected, and unavoidable liens in existence immediately prior to the Petition Date, or to any valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which security interests and liens in favor of the DIP Agents are junior to such valid, perfected, and unavoidable liens.

(f)    <u>Other Liens</u>. The DIP Liens and the Adequate Protection Liens (as defined below) shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) unless otherwise provided for in the DIP Documents, any

liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board, or court for any liability of the Debtors.

(g)    Specified Contracts.    Notwithstanding anything to the contrary in the Motion, the DIP Documents, the Interim Order, or this Final Order, for purposes of this Final Order, in no event shall the Collateral include or the DIP Liens granted under this Final Order attach to, any lease, license, contract, or agreement or other property right, to which any Debtor is a party, or any of such relevant Debtor's rights or interests thereunder, if and for so long as the grant of such security interest would constitute or result in:  (x) the abandonment, invalidation, unenforceability, or other impairment of any right, title, or interest of any Debtor therein, or (y) in a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract, agreement, or other property right pursuant to any provision thereof, unless, in the case of each of clauses (x) and (y), the applicable provision is rendered ineffective by applicable non-bankruptcy law or the Bankruptcy Code (such leases, licenses, contracts or agreements, or other property rights are collectively referred to as the "**Specified Contracts**"); *provided that*, the foregoing  shall not preclude any counterparty  to a Specified Contract from an opportunity to be heard in this Court on notice with respect to whether applicable non bankruptcy  law  or  the  Bankruptcy  Code  renders  such  provision  ineffective. Notwithstanding the foregoing, the DIP Liens shall in all events attach to all proceeds,

products, offspring, or profits from all sales, transfers, dispositions, or monetizations of

any and all Specified Contracts.

9.    *Real Property Leases*.    As a requirement and precondition to the DIP

Lenders' willingness to lend and in furtherance of the Superpriority Claims provided for

in Paragraph 7of this Final Order and pursuant to the DIP Documents, which are payable

from and have recourse to all of the Debtors' pre- and post-petition property including,

among other things, all of the Debtors' Real Property Leases (as defined in the First Out

DIP Credit Agreement), the First Out DIP Lenders shall have the following protections

with respect to the Debtors' Real Property Leases, regardless of whether any particular

Real Property Lease or group of Real Property Leases constitutes Collateral, which

protections shall be enforced by the First Out DIP Agent as authorized, approved, and

granted pursuant to the provisions of this Final Order and in accordance with the terms of

the First Out DIP Credit Agreement, *provided, however*, that upon the indefeasible

repayment in full in cash of all DIP Obligations owed to the First Out DIP Lenders

pursuant to the applicable DIP Documents (the "**F/O DIP Obligations**") and in

accordance with the provisions of this Final Order, the Second Out DIP Lenders shall

then be deemed to have the protections afforded the First Out DIP Lenders under this

Paragraph 9 with respect to the Real Property Leases, which protections shall then be

enforced by the Second Out DIP Agent as authorized, approved, and granted pursuant to

the provisions of this Final Order and, at such time, all references to the First Out DIP

Agent and the First Out DIP Lenders solely in the following subparagraphs of this

Paragraph 9 shall be deemed substituted in their entirety by reference to the Second Out DIP Agent or the Second Out DIP Lenders, as applicable:

(a)    <u>Remedies Upon an Event of Default</u>.  If an Event of Default shall have occurred and be continuing, the First Out DIP Agent shall, with respect to any Real Property Lease or group of Real Property Leases to which any of the Debtors are party, be permitted, and is hereby authorized, approved, and granted:

(i)    to exercise the Debtors' rights pursuant to section 365(f) of the Bankruptcy Code with respect to any such Real Property Lease(s) and, subject to this Court's approval after notice and hearing, assign any such Real Property Lease(s) in accordance with section 365 of the Bankruptcy Code notwithstanding any language to the contrary in any of the applicable lease documents or executory contracts;

(ii)    to require any Debtor to complete promptly, pursuant to Section 363 of the Bankruptcy Code, subject to the rights of the First Out DIP Lenders to credit bid, a Disposition (as defined in the First Out DIP Credit Agreement) of any such Real Property Lease(s) in one or more parcels at public or private sales, at any of the First Out DIP Agent's offices or elsewhere, for cash, at such time or times and at such price or prices and upon such other terms as the First Out DIP Agent may deem commercially reasonable;

(iii)     access to the leasehold interests of the Debtors or debtors-in-possession in any such Real Property Lease(s) for the purpose of marketing such property or properties for sale;

(iv)     (a) find an acceptable (in the First Out DIP Agent's good faith and reasonable discretion) replacement lessee, which may include the First Out DIP Agent or any of its affiliates, to whom such Real Property Lease(s) may be assigned, (b) hold, and manage all aspects of, an auction or other bidding process to find such acceptable replacement lessee, (c) in connection with any such auction, agree, on behalf of the Loan Parties (as defined in the DIP Credit Agreements), to reimburse reasonable fees and expenses of any stalking horse bidder, if necessary, and/or (d) notify the Debtors of the selection of any replacement lessee pursuant to this Paragraph 9(a), upon receipt of which the Debtors shall promptly (1) file a motion seeking, on an expedited basis, approval of the Debtors' assumption and assignment of such Real Property Lease(s) to such proposed assignee, and (2) cure any defaults, if any, that have occurred and are continuing under such Real Property Lease(s) to the extent required by the Court (subject to the First Out DIP Lenders' right to cure defaults as set forth in Paragraph 9(e) of this Final Order); or

(v)     direct the Debtors to (a) assign any such Real Property Lease(s) to the First Out DIP Agent and First Out DIP Lenders as Collateral securing the DIP Obligations, subject to clause (b), if

29

applicable, (b) seek this Court's approval of the assumption of any such Real Property Lease(s) to the extent that this Court determines pursuant to a final order that an assumption is required in order to assign such lease or leases as Collateral, and (c) promptly cure any default that has occurred and is continuing under such Real Property Lease(s) to the extent required by the Court; *provided* that any assignment of any such Real Property Lease(s) as Collateral securing the DIP Obligations shall not impair the Debtors' ability to subsequently assume (if not already assumed) and assign such Real Property Lease(s) pursuant to section 365 of the Bankruptcy Code or to enjoy the protections of section 365(f) of the Bankruptcy Code with respect to any such assignment.

(b)      Right to Credit Bid.  Prior to any assignment of any Real Property Lease or group of Real Property Leases, the Debtors shall first provide at least five (5) business days' prior written notice (the "**Initial Notice Period**") to the First Out DIP Agent (unless such notice provision is waived by the First Out DIP Agent), which Initial Notice Period may be extended up to a further twenty-five (25) days by the First Out DIP Agent in its sole discretion by delivering written notice of such extension to the Debtors prior to expiration of the Initial Notice Period, and by any further period as is mutually agreeable between the First Out DIP Agent and the Borrower (such notice period being the "**Aggregate Notice Period**").  During such notice period, the First Out DIP Agent, on behalf of the applicable First Out DIP Lenders, shall be permitted to credit bid forgiveness of some or all of the outstanding F/O DIP Obligations (in an amount equal to

30

at least the consideration offered by any other party in respect of such assignment) outstanding under the Term Loan as consideration in exchange for any such Real Property Lease(s); *provided* that to the extent the Borrower is entitled to retain a portion of the total consideration paid in respect of such assignment in accordance with the First Out DIP Credit Agreement, the applicable portion of the consideration shall be paid in cash.  In addition, in connection with the exercise of any of the First Out DIP Agent's rights pursuant to the DIP Credit Agreements or this Final Order to direct or compel a sale or assignment of any Real Property Lease(s), the First Out DIP Agent, on behalf of the applicable First Out DIP Lenders, shall be permitted to credit bid forgiveness of some or all of the outstanding First Out DIP Obligations (in an amount equal to at least the consideration offered by any other party in respect of such sale or assignment) as consideration in exchange for such Real Property Lease(s).  Pursuant to section 364(e) of the Bankruptcy Code, absent a stay pending appeal, the First Out DIP Lenders' right to credit bid shall not be affected by the reversal or modification on appeal of the Debtors' authorization pursuant to this Final Order to obtain credit and incur debt as and in accordance with the terms set forth herein.

(c)      Right of First Refusal with Respect to Proposed Assignments and Rejections of Real Property Leases.  Unless all DIP Obligations shall have indefeasibly been satisfied in full in cash (and, with respect to outstanding letters of credit issued or deemed issued pursuant to the DIP Credit Agreements, cash collateralized in accordance with the provisions of the DIP Credit Agreements), the Debtors shall not seek, and it shall constitute, an Event of Default and terminate the right of the Debtors to use Cash

31

Collateral if any of the Debtors seeks, the assignment or other sale of, or the rejection or other termination of, or if there is entered an order pursuant to section 365 of the Bankruptcy Code assigning or rejecting, any Real Property Lease or group of Real Property Leases, or if any Real Property Lease or group of Real Property Leases is deemed rejected due to the expiration of the assumption period provided for in Section 365(d)(4) (the "**Statutory Rejection Date**"), without the Debtors' first providing thirty (30) days' prior written notice to the First Out DIP Agent (unless such notice requirement is waived by the First Out DIP Agent in its sole discretion), or if such notice is given more than thirty (30) days in advance of the Statutory Rejection Date, prior written notice at least equal to the Aggregate Notice Period; *provided, however*, that the right of first refusal of the First Out DIP Lenders as set forth in this subparagraph (c) shall not apply to (x) any assignment or sale of a Real Property Lease or group of Real Property Leases to a winning bidder at an auction authorized by this Court, (y) any assignment or sale of a Real Property Lease or group of Real Property Leases from one Debtor that is a Loan Party (as defined in the DIP Credit Agreements) to another Debtor that is a Loan Party (*provided, however,* that such intra-Debtor assignment shall be subject to the notice provisions set forth in this subparagraph (c)), or (z) so long as there has not occurred an Event of Default or that an Event of Default is ongoing, any assignment or sale of a Real Property Lease or group of Real Property Leases that are not Material Leases generating Net Cash Proceeds up to $20,000,000 in the aggregate value for all such sales or assignments.  During such notice period, the First Out DIP Agent shall be permitted to:

(i)      (a) notify the Debtors that it elects to take action pursuant

to this Paragraph 9(c), upon receipt of which the Debtors shall promptly

withdraw any previously filed rejection motion, (b) find an acceptable (in

the First Out DIP Agent's good faith and reasonable discretion)

replacement lessee, which may include the First Out DIP Agent or any of

its affiliates, to whom any such any Real Property Lease or group of Real

Property Leases may be assigned, (c) hold, and manage all aspects of, an

auction or other bidding process to find such acceptable replacement

lessee, (d) in connection with any such auction, agree, on behalf of the

Loan Parties, to reimburse the reasonable fees and expenses of any

stalking horse bidder, if necessary, and (e) notify the Debtors of the

selection of any replacement lessee pursuant to this Paragraph 9(c), upon

receipt of which the Debtors shall (1) not seek to reject any such Real

Property Lease(s), (2) promptly withdraw any pending motion to reject

any such Real Property Lease(s), (3) promptly file a motion seeking, on an

expedited basis, approval of the Debtors' assumption and assignment of

such Real Property Lease(s) to the DIP Lenders' proposed assignee, and

(4) promptly cure any defaults that have occurred and are continuing

under such Real Property Lease(s) to the extent required by the Court; or

(ii)      direct the Debtors to (a) assign any Real Property Lease or

group of Real Property Leases as Collateral securing the DIP Obligations,

(b) seek the Court's approval of the assumption of any such Real Property

Lease(s) if it is determined pursuant to a final order of this Court that an assumption is required in order to assign such lease(s) as Collateral, and (c) promptly cure any defaults that have occurred and are continuing under such Real Property Lease(s) (subject to the First Out DIP Lenders' right to cure defaults as set forth in Paragraph 9(d) of this Final Order) to the extent required by the Court; *provided* that any assignment of any Real Property Lease(s) as Collateral securing the First Out DIP Obligations shall not impair the Debtors' ability to subsequently assume (if not already assumed) and assign any such Real Property Lease(s) pursuant to section 365 of the Bankruptcy Code or to enjoy the protections of section 365(f) of the Bankruptcy Code with respect to any such assignment.

Notwithstanding anything to the contrary herein, the foregoing right of the First Out DIP Agent set forth in this Paragraph 9(c) shall not apply to Real Property Leases that are rejected, terminated, sold, or assigned (i) pursuant to a filing made on the Petition Date or (ii) on the Effective Date of an Acceptable Reorganization Plan (as defined in the First Out DIP Credit Agreement) that, among other things, indefeasibly repays the DIP Obligations in full and replaces Cash Collateral for all outstanding Letters of Credit (as defined in the DIP Credit Agreements) as required by the DIP Documents. For the avoidance of doubt, on or prior to the thirtieth (30) day prior to the Statutory Rejection Date (as provided in Section 365(d)(4) of the Bankruptcy Code), the Debtors shall have delivered written notice to the First Out DIP Agent of each outstanding Real Property Lease that they intend to reject (including, without limitation, through statutory rejection

on the Statutory Rejection Date) from and after the date of such notice (or, if applicable,

notice that the Debtors have obtained the applicable landlord's consent to extension of

the Statutory Rejection Date); *provided* that if the Debtors fail to deliver any such notice

to the First Out DIP Agent prior to such date with respect to any such Real Property

Lease(s) (or a notice indicating that no such Real Property Lease(s) shall be rejected), the

Debtors shall be deemed, for all purposes hereunder, to have delivered notice to the First

Out DIP Agent as of such date that they intend to reject all outstanding Real Property

Leases.

(d)    <u>Assumption Orders</u>.    Any order of this Court approving the

assumption of any Real Property Lease shall specifically provide that the applicable

Debtor shall be authorized to assign such Real Property Lease pursuant to, and to enjoy

the protections of, section 365(f) of the Bankruptcy Code subsequent to the date of such

assumption.  To the extent that such provision is for any reason not included in any order

of the Court approving the assumption of any Real Property Lease, then such Real

Property Lease may not be assumed by the applicable Debtor unless the order approving

the assumption provides for the assignment of such Real Property Lease, on the date of

such order, to an acceptable (in the First Out DIP Agent's good faith and reasonable

discretion) replacement lessee (which may include the First Out DIP Agent or its

affiliates).

(e)    <u>DIP Lenders' Right to Cure Defaults</u>.    If any of the Debtors is

required to cure any monetary defaults under any Real Property Lease pursuant to any

order of this Court or otherwise in connection with any assumption or assumption and

assignment of any such Real Property Lease pursuant to section 365(f) of the Bankruptcy Code, and such monetary default is not, within five (5) business days of the receipt by such Debtor of notice from the First Out DIP Agent pursuant to the applicable provision(s) of the First Out DIP Credit Agreement or any other notice from the First Out DIP Agent requesting the cure of such monetary default, cured in accordance with the provisions of such applicable court order as arranged by the First Out DIP Agent, the First Out DIP Agent may cure any such monetary defaults on behalf of the applicable Debtor(s).

10.   *Protection of DIP Lenders' Rights.*

(a)   So long as there are any borrowings or letters of credit or other amounts (other than contingent indemnity obligations as to which no claim has been asserted when all other amounts have been indefeasibly paid in full in cash and no letters of credit are outstanding) outstanding, or the DIP Lenders have any Commitments (as defined in the DIP Credit Agreements) under the DIP Credit Agreements, the Pre-Petition Agent and the Pre-Petition Credit Agreement Lenders shall (i) have no right to and take no action to foreclose upon or recover in connection with the liens granted thereto pursuant to the Pre-Petition Financing Agreements or this Final Order, or otherwise seek to exercise or exercise any enforcement rights or remedies against any Collateral or in connection with any Adequate Protection Liens or on account of any claims, (ii) be deemed to have consented to any transfer, disposition, or sale of, or release of liens on, Collateral, to the extent such transfer, disposition, sale, or release is authorized under the DIP Documents, (iii) not file any financing statements, trademark filings, copyright

36

filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the Collateral unless, solely as to this clause (iii), the DIP Lenders file financing statements or other documents to perfect the liens granted pursuant to this Final Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Petition Date, and (iv) deliver or cause to be delivered, at the Debtors' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of the Collateral subject to any sale or disposition.  After the refinancing in full of all Securitization L/Cs, the Debtors are authorized to file any termination statements, releases, or other documents necessary to effectuate and/or evidence the release and termination of the Pre-Petition Securitization Administrator's liens on or security interest in any portion of the Pre-Petition Collateral; and upon refinancing of the Securitization L/Cs (including, without limitation, their cash collateralization), all liens securing all assets (including proceeds, product, offspring or profits of same) pledged thereunder shall be fully released and become part of the Revolving Collateral.

(b)    Consistent with the provisions set forth in section 9.03 of the First Out DIP Credit Agreement and Section 8.02 of the Second Out DIP Credit Agreement (but subject to the terms of the Security Agreement), the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary upon the occurrence of an Event of Default (as defined in the DIP Documents) so as to

permit the DIP Agents and the DIP Lenders to, among other things, immediately declare (1) the commitment of the DIP Lenders as to the Financing to be terminated, whereupon such commitments and obligation shall be terminated; (2) all DIP Obligations immediately due and owing, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; (3) require any Loan Party (as defined in the DIP Credit Agreements) to promptly complete, pursuant to Section 363 and 365 of the Bankruptcy Code, subject to the rights of the DIP Lenders to credit bid, a Disposition (as defined in the DIP Credit Agreements) of its Real Property Leases or any portion thereof in one or more parcels at public or private sales, at any of the applicable DIP Agent's offices or elsewhere, for cash, at such time or times and at such price or prices and upon such other terms as the applicable DIP Agent may deem commercially reasonable; and (4) exercise any of their rights with respect to Real Property Leases under Paragraph 9 hereof; *provided however*, that with respect to any enforcement of DIP Liens or remedies (including, all remedies that may be enforced pursuant to Paragraph 9(a) of this Final Order) other than those expressly set forth in subsections (1) and (2) of this sentence, the applicable DIP Agent shall provide the Borrower (with a copy to counsel for the Creditors' Committee and to the U.S. Trustee) with seven (7) days' prior written notice prior to taking the actions contemplated thereby. In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors and the Pre-Petition Secured Lenders shall not be entitled to seek relief, including, without limitation, under section 105 of the

Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Agents or the DIP Lenders set forth in this Final Order or the DIP Documents.  In no event shall the DIP Agents or the DIP Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

(c)     No rights, protections, or remedies of the DIP Agents or the DIP Lenders granted by the provisions of this Final Order or the DIP Documents shall be limited, modified, or impaired in any way by (i) any actual or purported withdrawal of the consent of any party to the Debtors' authority to use Cash Collateral, (ii) any actual or purported termination of the Debtors' authority to use Cash Collateral, or (iii) the terms of this Final Order or any other order or stipulation related to the Debtors' use of Cash Collateral or the provision of adequate protection to any party.

11.     *Limitation on Charging Expenses Against Collateral*.  Except to the extent of the Carve Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law without the prior written consent of the applicable DIP Agent or the Pre-Petition Agent (solely with respect to Cash Collateral), as the case may be, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agents, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition Credit Agreement Lenders.

12.    *The Cash Collateral*.  The Pre-Petition Collateral includes cash collateral within the meaning of section 363(a) of the Bankruptcy Code.  To the extent that any funds were on deposit with any Pre-Petition Credit Agreement Lender as of the Petition Date, including, without limitation, all funds deposited in, or credited to, an account of any Debtor with any Pre-Petition Credit Agreement Lender immediately prior to the filing of the Debtors' bankruptcy petitions (the "**Pre-Petition Period**") (regardless of whether, as of the Pre-Petition Period, such funds had been collected or made available for withdrawal by any such Debtor), then such funds (the "**Deposited Funds**") are subject to rights of setoff.  By virtue of such setoff rights, the Deposited Funds are subject to a lien in favor of such Pre-Petition Credit Agreement Lender pursuant to sections 506(a) and 553 of the Bankruptcy Code, which is subordinate to the First Out DIP Lenders' senior interests in the Deposited Funds as set forth in the Security Agreement. The Pre-Petition Credit Agreement Lenders are obligated, to the extent provided in the Pre-Petition Financing Agreements, to share the benefit of such liens and setoff rights with the other Pre-Petition Credit Agreement Lenders pursuant to and in accordance with the Pre-Petition Financing Agreements.  Any proceeds of the Pre-Petition Collateral (including the Deposited Funds or any other funds on deposit at the Pre-Petition Credit Agreement Lenders or at any other institution as of the Petition Date) are cash collateral of the Pre-Petition Credit Agreement Lenders within the meaning of section 363(a) of the Bankruptcy Code.  The Deposited Funds, together with such other cash collateral of any of the Pre-Petition Credit Agreement Lenders within the meaning of section 363(a) of the

Bankruptcy Code (including, without limitation, all proceeds of Pre-Petition Collateral) are collectively referred to herein as "**Cash Collateral**."

13.    *Use of Cash Collateral*.  The Debtors are hereby authorized, subject to the terms and conditions of the DIP Documents and this Final Order, to use all Cash Collateral, and each of the Pre-Petition Credit Agreement Lenders is directed promptly to turn over to the Debtors all Cash Collateral received or held by them; *provided* that the Pre-Petition Credit Agreement Lenders are granted adequate protection as hereinafter set forth.

14.    *Adequate Protection*.  The Pre-Petition Credit Agreement Lenders are entitled, pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, to adequate protection of their interest in the Collateral, for and equal in amount to the aggregate diminution in the value of the Pre-Petition Credit Agreement Lenders' interest in the Collateral, including, without limitation, any such diminution resulting from the sale, lease, or use by the Debtors (or other decline in value) of Collateral, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.  As adequate protection, the Pre-Petition Agent and the Pre-Petition Credit Agreement Lenders are hereby granted the following (collectively, the **"Adequate Protection Obligations"**):

(a)    <u>Adequate Protection Liens</u>.  The Pre-Petition Agent (for itself and for the benefit of the Pre-Petition Credit Agreement Lenders) is hereby granted (effective and perfected upon the date of this Final Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing

41

statements, or other agreements), in the amount of such diminution, a replacement security interest in and lien upon all the Collateral, subject and subordinate only to (i) the security interests and liens granted to the DIP Agents for the benefit of the DIP Lenders in this Final Order and pursuant to the DIP Documents and any liens on the Collateral to which such liens so granted to the DIP Agents are junior, and (ii) the Carve Out (such liens securing the Adequate Protection Obligations, the "**Adequate Protection Liens**").

(b)    Preservation of Pre-Petition Liens.  To the extent replacement liens are not available, the liens granted to the Pre-Petition Credit Agreement Lenders under the terms of the Pre-Petition Credit Agreement shall continue in full force and effect and shall continue to secure the Obligations of the Debtors under the Pre-Petition Credit Agreement, regardless of whether such Obligations were rolled up in the Second Out Facility and such liens held by the Pre-Petition Agent shall be held in accordance with the provisions of the Security Agreement for the benefit of the First Out DIP Lenders or the Second Out DIP Lenders, as applicable.

(c)    Section 507(b) Claim.  The Pre-Petition Agent and the Pre-Petition Credit Agreement Lenders are hereby granted, subject to the Carve Out, a superpriority claim, as provided for in section 507(b) of the Bankruptcy Code, immediately junior to the claims under section 364(c)(1) of the Bankruptcy Code held by the DIP Agents and the DIP Lenders; *provided, however*, that the Pre-Petition Agent and the Pre-Petition Credit Agreement Lenders shall not receive or retain any payments, property or other amounts in respect of the superpriority claims under section 507(b) of the Bankruptcy

Code granted hereunder unless and until the DIP Obligations have indefeasibly been paid in cash in full.

15.    *Sufficiency of Adequate Protection*.    Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Pre-Petition Credit Agreement Lenders.    Except as expressly provided herein or in the DIP Documents, nothing contained in this Final Order (including, without limitation, the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims, or defenses available in law or equity to the Pre-Petition Agent, any Pre-Petition Credit Agreement Lender, the DIP Agents, or any DIP Lender including, without limitation, rights of a party to a swap agreement, securities contract, commodity contract, forward contract, or repurchase agreement with a Debtor to assert rights of setoff or other rights with respect thereto as permitted by law (or the right of a Debtor to contest such assertion).

16.    *Perfection of DIP Liens and Adequate Protection Liens.*

(a)    Subject to the provisions of Paragraph 10(a) of this Final Order, the DIP Agents, the DIP Lenders, the Pre-Petition Agent, and the Pre-Petition Credit Agreement Lenders are hereby authorized, but not required, to file or record financing statements, patent filings, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over assets, or take any other action, in each case, in order to validate and perfect the liens and security interests granted to them hereunder.    Whether or not the DIP Agents on behalf of the DIP

43

Lenders or the Pre-Petition Agent on behalf of the Pre-Petition Credit Agreement Lenders shall, each in their respective sole discretion, choose to file such financing statements, patent filings, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination, at the time and on the date of entry of this Final Order.  Upon the request of the DIP Agents, the Pre-Petition Agent, without any further consent of any party, is authorized and directed to take, execute, deliver, and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agents to further validate, perfect, preserve, and enforce the DIP Liens.

(b)    A certified copy of this Final Order may, in the discretion of either DIP Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Final Order for filing and recording.

(c)    The Debtors shall execute and deliver to the DIP Agents all such agreements, financing statements, instruments and other documents as the DIP Agents may reasonably request to evidence, confirm, validate, or perfect the DIP Liens.

17.    *Preservation of Rights Granted Under This Final Order.*

(a)    No claim or lien having a priority superior to or *pari passu* with those granted by this Final Order to the DIP Agents and the DIP Lenders or to the Pre-

44

Petition Agent, and the Pre-Petition Credit Agreement Lenders, respectively, shall be granted or allowed while any portion of the Financing (or any refinancing thereof) or the Commitments thereunder or the DIP Obligations or any Adequate Protection Obligations remain outstanding, and the DIP Liens and the Adequate Protection Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether pursuant to section 364(d) of the Bankruptcy Code or otherwise.  For the avoidance of doubt, no lien or security interest shall be granted to any other party in any of the Specified Contracts without first granting such lien or security interest to the DIP Agents, which shall be deemed Term or Second Out Collateral.

(b)    Under no circumstances, and in accordance with the provisions of the DIP Documents, shall the Cases be dismissed unless the F/O DIP Obligations shall have been indefeasibly paid in full in cash (and/or, with respect to outstanding letters of credit issued or deemed issued pursuant to the First Out DIP Credit Agreement, cash collateralized in accordance with the provisions thereof); *provided, moreover*, that in the event of such dismissal, the Pre-Petition Liens, DIP Liens, and Adequate Protection Liens held by the Pre-Petition Lenders shall remain in full force and effect, with all rights and remedies attendant thereto.  In addition, unless all DIP Obligations shall have been indefeasibly paid in full in cash (and, with respect to outstanding letters of credit issued or deemed issued pursuant to the DIP Credit Agreements, cash collateralized in accordance with the provisions of the DIP Credit Agreements) and the Adequate

Protection Obligations (if any) shall have been paid in full, the Debtors shall not seek, and it shall constitute an Event of Default and terminate the right of the Debtors to use Cash Collateral if any of the Debtors seeks, or if there is entered, (i) any modification or extension of this Final Order without the prior written consent of the DIP Agents, and no such consent shall be implied by any other action, inaction, or acquiescence by the DIP Agents, (ii) an order converting or dismissing any of the Cases, (iii) an order appointing a chapter 11 trustee in any of the Cases, or (iv) an order appointing an examiner with enlarged powers in any of the Cases.  If an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the Superpriority Claims, liens, security interests, and replacement security interests granted to the DIP Agents and the DIP Lenders and, as applicable, the Pre-Petition Agent and the Pre-Petition Credit Agreement Lenders, pursuant to this Final Order shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations and the Adequate Protection Obligations (if any) shall have been paid and satisfied in full (and that such Superpriority Claims, liens, and replacement security interests, shall, notwithstanding such dismissal, remain binding on all parties in interest) and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in clause (i) above.

(c)    If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated, or stayed, such reversal, modification, vacation, or stay shall

not affect (i) the validity of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agents or the Pre-Petition Agent, as applicable, of the effective date of such reversal, modification, vacation, or stay or (ii) the validity or enforceability of any lien, priority, or other right authorized or created hereby or pursuant to the DIP Documents with respect to any DIP Obligations or Adequate Protection Obligations.   Notwithstanding any such reversal, modification, vacation, or stay, or any use of Cash Collateral, or DIP Obligations or Adequate Protection Obligations incurred by the Debtors to the DIP Agents, the DIP Lenders, the Pre-Petition Agent, or the Pre-Petition Credit Agreement Lenders prior to the actual receipt of written notice by the DIP Agents and the Pre-Petition Agent of the effective date of such reversal, modification, vacation, or stay shall be governed in all respects by the original provisions of this Final Order, and the DIP Agents, the DIP Lenders, the Pre-Petition Agent, and the Pre-Petition Credit Agreement Lenders shall be entitled to all the rights, remedies, privileges, and benefits granted in section 364(e) of the Bankruptcy Code (including, without limitation, in respect of any payments received in connection with the refinancing of the Pre-Petition Debt), this Final Order and pursuant to the DIP Documents with respect to all uses of Cash Collateral and proceeds of the Financing, DIP Obligations, and the Adequate Protection Obligations.

(d)      Except as expressly provided in this Final Order or in the DIP Documents, the DIP Liens, the Superpriority Claims and all other rights and remedies of the DIP Agents and the DIP Lenders, and the Adequate Protection Liens granted by the provisions of this Final Order and the DIP Documents shall survive, and shall not be

modified, impaired, or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases, or by any other act or omission, (ii) the entry of an order approving the sale of any Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents), or (iii) the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations.  The terms and provisions of this Final Order and the DIP Documents shall continue in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the Superpriority Claims, all other rights and remedies of the DIP Agents and the DIP Lenders granted by the provisions of this Final Order (including, without limitation, with respect to the rights of the DIP Agents, as applicable, as to the Debtors' Real Property Leases as set forth in Paragraph 9 of this Final Order) and the DIP Documents shall continue in full force and effect (and be binding on any successor in interest to the debtors-in-possession) until the DIP Obligations are indefeasibly paid in full in cash.

18.     *Recourse of Certain Superpriority and Adequate Protection Claims to Specific Proceeds*.  Notwithstanding any other provision of this Final Order: (i) neither the Superpriority Claims of the Second Out DIP Lenders nor any Adequate Protection Claims of the Pre-Petition Secured Parties shall be payable from Avoidance Proceeds, if any, resulting from Claims or Defenses successfully asserted by the Creditors' Committee

48

against the Pre-Petition Secured Parties in their capacities as such with respect to the Pre-Petition Credit Agreement; and (ii) no Superpriority Claims of the Pre-Petition Joint Lead Arrangers held in connection with their holdings in the First Out DIP Facility as of the completion and the closing of the syndication of the First Out Facility (which completion and closing shall be deemed to have occurred prior to the entry of this Final Order) shall be payable from proceeds, if any, of Claims and Defenses successfully asserted by the Creditors' Committee against the Pre-Petition Joint Lead Arrangers with respect to the Commitment Letter (as defined below); *provided however*, that the provisions of this paragraph 18 shall not modify or otherwise relieve the Debtors of their obligations to pay all DIP Obligations and Adequate Protection Obligations to all of the DIP Lenders (including the Pre-Petition Joint Lead Arrangers) on a pro rata basis from any other source.

19.    *Effect of Stipulations on Third Parties*.  The stipulations and admissions contained in this Final Order, including, without limitation, in Paragraph 4 of this Final Order, shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) in all circumstances.  The stipulations and admissions contained in this Final Order, including, without limitation, in Paragraph 4 of this Final Order, shall be binding upon all other parties in interest, including, without limitation, any statutory or nonstatutory committees appointed or formed in these Cases (including the Creditors' Committee) and any other person or entity acting on behalf of the Debtors' estates, unless (a) a party in interest has timely filed an adversary proceeding or contested matter (subject to the

limitations contained herein, including, *inter alia*, in Paragraph 20 of this Final Order) by the date that is ninety (90) days after entry of this Final Order or such later date (x) as has been agreed to, in writing, by the Pre-Petition Agent, the Pre-Petition Securitization Administrator, or the Pre-Petition Joint Lead Arrangers, as the case may be, and, as applicable, in its sole discretion or (y) as has been ordered by the Court (the "**Challenge Deadline**"), (i) challenging the validity, enforceability, priority, or extent of the Pre-Petition Debt or the Pre-Petition Agent's, the Pre-Petition Securitization Administrator's, or the Pre-Petition Secured Lenders' liens on the Pre-Petition Collateral or (ii) otherwise asserting or prosecuting any (A) action for preferences, fraudulent conveyances, other avoidance power claims, or any other claims, counterclaims or causes of action, objections, contests, or defenses against the Pre-Petition Agent, the Pre-Petition Securitization Administrator, any of the Pre-Petition Secured Lenders, or their affiliates, representatives, attorneys, or advisors (the "**Pre-Petition Secured Parties**") in connection with matters related to the Pre-Petition Financing Agreements, the Pre-Petition Debt or the Pre-Petition Collateral, as applicable or (B) any causes of action against Citigroup Global Markets Inc., Barclays Bank PLC, or Natixis, New York Branch (the "**Pre-Petition Joint Lead Arrangers**") arising in connection with the commitment letter (the "**Commitment Letter**") referenced in the Motion ((A) and (B) together, the "**Claims and Defenses**"); *provided*, that if the Creditors' Committee files a motion seeking standing to bring Claims or Defenses against any of the Pre-Petition Secured Parties or the Pre-Petition Joint Lead Arrangers prior to the Challenge Deadline, the Challenge Deadline shall be tolled until adjudication of such motion; and (b) there is a

final order in favor of the plaintiff sustaining any such challenge or claim in any such timely filed adversary proceeding or contested matter; *provided* that any challenge or claim shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the Challenge Deadline shall be forever deemed waived, released, and barred.  If no such adversary proceeding or contested matter is timely filed, (w) the Pre-Petition Debt and all related obligations of the Debtors (the "**Pre-Petition Obligations**") shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense, or avoidance, for all purposes in the Cases and any subsequent chapter 7 cases, (x) the Pre-Petition Agent's liens, the Pre-Petition Securitization Administrator's liens, and the Pre-Petition Secured Lenders' liens on the Pre-Petition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding and perfected, not subject to recharacterization, subordination, or avoidance, (y) the Pre-Petition Obligations, the Pre-Petition Agent's, the Pre-Petition Securitization Administrator's, and the Pre-Petition Secured Lenders' liens on the Pre-Petition Collateral and the Pre-Petition Agent, the Pre-Petition Securitization Administrator, the Pre-Petition Secured Lenders, and the Pre-Petition Joint Lead Arrangers shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 or 11 trustee appointed or elected for any of the Debtors), and (z) the refinancing of the Pre-Petition Debt (including the L/C Roll Up) shall be irrevocable and shall not be subject to restitution, disgorgement, or any other challenge under any circumstances, including,

without limitation, pursuant to any Claims and Defenses (as defined above).  If any such

adversary proceeding or contested matter is timely filed, the stipulations and admissions

contained in Paragraph 4 of this Final Order shall nonetheless remain binding and

preclusive (as provided in the second sentence of this Paragraph 19) on any statutory or

nonstatutory committees appointed or formed in these Cases (including the Creditors'

Committee) and on any other person or entity, except to the extent that such findings and

admissions were expressly challenged in such adversary proceeding or contested matter.

Nothing in this Final Order vests or confers on any Person (as defined in the Bankruptcy

Code), including any statutory or nonstatutory committees appointed or formed in these

Cases (including the Creditors' Committee), standing or authority to pursue any cause of

action belonging to the Debtors or their estates, including, without limitation, Claims and

Defenses with respect to the Pre-Petition Financing Agreements, the Commitment Letter,

or the Pre-Petition Obligations.  For the avoidance of doubt, none of the foregoing

challenge provisions set forth in this Paragraph 19 shall apply to the First Out DIP

Facility or the First Out DIP Lenders in their capacities as such, and in no event shall the

First Out DIP Facility be subject to challenge on avoidance or any other grounds by any

other party.

20.    *Limitation on Use of Financing Proceeds and Collateral*.

Notwithstanding anything herein or in any other order by this Court to the contrary, no

borrowings, letters of credit, Cash Collateral, Collateral, or the Carve Out may be used to

(a) object, contest, or raise any defense to, the validity, perfection, priority, extent, or

enforceability of any amount due under the DIP Documents or the Pre-Petition Financing

52

Agreements, or the liens or claims granted under this Final Order, the DIP Documents or the Pre-Petition Financing Agreements, (b) assert any Claims and Defenses or causes of action against the DIP Agents, the DIP Lenders, the Pre-Petition Agent, the Pre-Petition Securitization Administrator, or the Pre-Petition Secured Lenders, or their respective agents, affiliates, representatives, attorneys, or advisors, (c) prevent, hinder, or otherwise delay the DIP Agents', the Pre-Petition Agent's, or the Pre-Petition Securitization Administrator's assertion, enforcement, or realization on the Cash Collateral or the Collateral in accordance with the DIP Documents, the Pre-Petition Financing Agreements, or this Final Order, (d) seek to modify any of the rights granted to the DIP Agents, the DIP Lenders, the Pre-Petition Agent, the Pre-Petition Securitization Administrator, or the Pre-Petition Secured Lenders hereunder or under the DIP Documents or the Pre-Petition Financing Agreements, in each of the foregoing cases without such applicable parties' prior written consent, or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) in accordance with the DIP Credit Agreements and the Budget as approved by the DIP Agents, each in its respective sole discretion. Notwithstanding the foregoing, advisors to the Creditors' Committee may investigate and prepare (but not initiate or prosecute) any Claims and Defenses against any of the Pre-Petition Secured Parties or the Pre-Petition Joint Lead Arrangers, as applicable, in connection with matters related to the Pre-Petition Financing Agreements, the Pre-Petition Debt, the Pre-Petition Collateral or the Commitment Letter prior to the Challenge Deadline at an aggregate expense not to exceed $250,000.

53

21.    *Priorities    Among    Pre-Petition    Credit    Agreement    Lenders*. Notwithstanding anything to the contrary herein or in any other order of this Court, in determining the relative priorities and rights of the Pre-Petition Credit Agreement Lenders with respect to the Adequate Protection Obligations granted hereunder, such priorities and rights shall continue to be governed by the Pre-Petition Credit Agreement.

22.    *Maintenance of Letters of Credit.*  To the extent permitted by the DIP Documents, the Debtors are authorized to maintain and renew letters of credit issued or deemed issued under the DIP Credit Agreements on an uninterrupted basis, in accordance with the same practices and procedures as were in effect prior to the Petition Date, and to take all actions reasonably appropriate with respect thereto, on an uninterrupted basis and in accordance with the same practices and procedures as were in effect prior to the Petition Date, *provided, however*, that not later than two (2) business days after either the First Out DIP Agent or the Second Out DIP Agent, as applicable, directs any (a) First Out L/C Issuer not to permit the automatic extension of a Letter of Credit under the First Out DIP Facility, or (b) Rolled Up L/C Issuer not to permit the automatic extension of a Roll Up Letter of Credit under the Second Out DIP Facility, the First Out DIP Agent or the Second Out DIP Agent, as applicable, shall provide written notice of such direction to counsel for the Creditors' Committee.

23.    *Consensual Plan Treatment in Respect of the Second Out Facility.*  To the extent any obligations under the Second Out Facility remain outstanding on the date of confirmation of any plan of reorganization for the Debtors under chapter 11 of the Bankruptcy Code (a "**Plan**"), such obligations shall be repaid in cash (or, in the case of

issued and outstanding Roll Up Letters of Credit, cash collateralized in an amount of at least 105% of the L/C Obligations (as defined in the Second Out DIP Agreement)) on the effective date of such Plan; *provided, however*, that notwithstanding anything to the contrary in this Final Order or the DIP Documents, the Second Out DIP Lenders may consent to a different treatment under a Plan, and such consent shall be deemed to have been given upon the affirmative vote of the Second Out DIP Lenders under the standards set forth in Section 1126(c) of the Bankruptcy Code, it being understood that the foregoing does not in any way change the payment priorities set forth in the Security Agreement.

24.    *Exculpation*.    Nothing in this Final Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Agent, the Joint Lead Arrangers, or any DIP Lender any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts. So long as the DIP Agents and the DIP Lenders comply with their obligations under the DIP Documents and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Agents and the DIP Lenders shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (b) all risk of loss, damage, or destruction of the Collateral shall be borne by the Debtors, so long as the DIP

Lenders' actions do not constitute, within the meaning of 42 U.S.C. § 9601 (20)(F), actual participation in the management or operational affairs of a vessel or facility owned or operated by a Debtor, or otherwise cause liability to arise to the federal or state government or the status of responsible person or managing agent to exist under applicable law.

25.    *Miscellaneous*.

(a)    Nothing in this Final Order or the DIP Documents shall limit the Debtors' obligations pursuant to 28 U.S.C. § 959(b).  As to the United States, any State or municipality and any of the foregoing's respective agencies, departments or agents, nothing in this Final Order or the DIP Documents shall discharge, release or otherwise preclude any valid right of setoff or recoupment that any such entity may have.

(b)    Any claim of a Debtor under Section 11.02 (a "**First Out Contribution Claim**") or 11.03 (a "**First Out Subrogation Claim**") of the First Out DIP Credit Agreement or Section 2.02 (a "**Second Out Contribution Claim**"; each of a First out Contribution Claim or a Second Out Contribution Claim, a "**Contribution Claim**") or Section 2.03 (a "**Second Out Subrogation Claim**; each of a First Out Subrogation Claim or a Second Out Subrogation Claim, a "**Subrogation Claim**") of the Amended and Restated Guarantee, dated as of July 11, 2012, between Patriot Coal Corporation and the Second Out Administrative Agent (the "**Second Out Guarantee**") against any other Debtor that may arise during these Cases (including, but not limited to, by virtue of a mandatory prepayment of the DIP Obligations from the Net Cash Proceeds (as defined in the First Out DIP Credit Agreement or the Second Out DIP Credit Agreement) of a

56

disposition of such Debtor's property or an Extraordinary Receipt (as defined in the First

Out DIP Credit Agreement or the Second Out DIP Credit Agreement) shall constitute a

superpriority administrative claim pursuant to Section 364(c)(1) of the Bankruptcy Code

against each other Debtor that is liable in respect of such Contribution Claim or

Subrogation Claim, in each case (a) junior and subordinate only to the DIP Liens and

Superpriority Claims granted hereunder as security for the DIP Obligations, the Adequate

Protection Liens granted hereunder and the Carve-Out and (b) *pari passu* with any

superpriority administrative claims that may arise under the Final Order Authorizing (i)

Debtors to Continue to Use Existing Cash Management System and Maintain Existing

Bank Accounts and Business Forms and (ii) Financial Institutions to Honor and Process

Related Checks and Transfers ("**Cash Management Order**") on account of "Post-

Petition Transfers" (as defined in the Cash Management Order).  Notwithstanding

anything to the contrary herein, the provisions of Section 11.03 of the First-Out DIP

Credit Agreement and Section 2.03 of the Second Out Guarantee shall remain applicable

to any such Contribution Claim or Subrogation Claim and, without limitation of the

provisions of Section 11.03 and Section 2.03 of the Second Out Guarantee, no payment

in respect to any such Contribution Claim or Subrogation Claim may be made until all

DIP Obligations have been paid in full (or in the case of any letters of credit which shall

remain outstanding, collateralized with cash or "back-to-back" letters of credit or

otherwise supported) in each case, on terms satisfactory to the Administrative Agent.

(c)      *Notice to the Creditors' Committee*.  The Debtors shall provide to

the Creditors' Committee copies of the financial statements, reports and other written

information that the Debtors are expressly required to provide to the DIP Agents and the

DIP Lenders pursuant to the DIP Credit Agreements as and when the Debtors provide

such information to the DIP Agents and/or the DIP Lenders.  Upon the receipt of any

notice provided by the DIP Agents or the DIP Lenders to the Debtors under this Final

Order or the DIP Documents, the Debtors shall promptly provide a copy of such notice to

the Creditors' Committee.

26.     *Amendments to the DIP Documents*.  This Final Order expressly amends

the DIP Documents as follows:

(a)     *The First Out DIP Credit Agreement*.

(i)     The following defined terms "Applicable Rate", "Change

of Control", and "Extension Fee" are hereby amended and replaced in

their entirety as follows:

"**Applicable Rate**" means (a) with respect to Revolving Credit Loans, (i) 3.25%
per annum, in the case of Eurocurrency Rate Loans and Letters of Credit, (ii)
2.25% per annum, in the case of Base Rate Loans and (iii) 0.75% per annum, in
the case of Revolving Commitment Fees and (b) with respect to Term Loans,
(i) 7.75% per annum, in the case of Eurocurrency Rate Loans and (ii) 6.75% per
annum, in the case of Base Rate Loans and (iii) 0.75% per annum, in the case of
Term Commitment Fees.

"**Change of Control**" means:

(a)     an event or series of events by which any "person" or "group" (as
such terms are used in Sections 13(d) and 14(d) of the Securities Exchange
Act of 1934, but excluding any employee benefit plan of such person or its
subsidiaries, and any person or entity acting in its capacity as trustee,
agent or other fiduciary or administrator of any such plan) becomes the
"beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the
Securities Exchange Act of 1934, directly or indirectly, of more than 50%
of the equity securities of the Borrower entitled to vote for members of the
board of directors or equivalent governing body of the Borrower on a

58

fully-diluted basis; or

(b)       during any period of 12 consecutive months, a majority of the members of the board of directors or other equivalent governing body of the Borrower after the date of this Agreement cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body (excluding, in the case of both clause (ii) and clause (iii), any individual whose initial nomination for, or assumption of office as, a member of that board or equivalent governing body occurs as a result of an actual or threatened solicitation of proxies or consents for the election or removal of one or more directors by any person or group other than a solicitation for the election of one or more directors by or on behalf of the board of directors).

"**Extension Fee**" has the meaning specified in Section 2.10(c).

(ii)       Section 2.10(c) of the First Out DIP Credit Agreement is

hereby amended and replaced in its entirety as follows:

*Extension Fee.*  If the Borrower elects, subject to the occurrence of the Extension Date, to extend the Maturity Date of the Facilities, the Borrower shall pay to the Administrative Agent for the account of each Lender in accordance with its Applicable Percentage, an extension fee (the "**Extension Fee**") equal to 0.25% of the aggregate Revolving Credit Commitments and Term Loans of all Lenders outstanding on the Extension Date.

(b)       *The Second Out DIP Credit Agreement.*  Section 2.01(g)(ii) of the

Second Out DIP Credit Agreement is hereby amended and replaced in its entirety as

follows:

Sections 2.01, 2.03, 2.04, 2.11 and 8.02 (a)(ii) set forth certain additional requirements to deliver cash collateral hereunder.  For purposes of this Section 2.01, Section 2.03, Section 2.04, Section 2.11 and Section

8.02(a)(ii), "<u>Cash Collateralize</u>" means to pledge to the Administrative Agent and deposit in the Cash Collateral Account, for the benefit of the each Issuer and the Lenders, as collateral for the L/C Obligations, cash or deposit account balances in an amount of at least 103% of the L/C Obligations pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent and the relevant L/C Issuer (which documents are hereby consented to by the Lenders).

27.     *Binding Effect; Successors and Assigns.*   The DIP Documents and the provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including, without limitation, the DIP Agents, the DIP Lenders, the Pre-Petition Agent, the Pre-Petition Joint Lead Arrangers, the Pre-Petition Securitization Administrator, the Pre-Petition Secured Lenders, any Committee appointed or formed in these Cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors) and shall inure to the benefit of the DIP Agents, the DIP Lenders, the Pre-Petition Agent, the Pre-Petition Securitization Administrator, the Pre-Petition Secured Lenders, and the Debtors and their respective successors and assigns; *provided*, *however*, that neither the DIP Agents nor the DIP Lenders shall have any obligation to extend any financing or credit to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.  In determining to make any loan under the DIP Credit Agreements or in exercising any rights or remedies as and when permitted pursuant to this Final Order or the DIP Documents, the DIP Agents and the DIP Lenders shall not be deemed to be in control of the operations of or participating in the management of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms or

any similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, *et seq.*, as amended, or any similar federal or state statute).

28.     *Effectiveness*.    This Final Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.    Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

29.     *Headings*.    Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

30.     *The Interim Order.* Except as specifically amended, supplemented or otherwise modified hereby, all of the provisions of the Interim Order shall remain in effect and are hereby ratified by this Final Order.

31.     *Final Order Governs*.    In the event of any inconsistency between the provisions of the Motion, this Final Order, the Interim Order, the Security Agreement, and the DIP Documents, the express provisions of this Final Order shall govern.

32.    *Jurisdiction*.    This Court shall have exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either the DIP Documents or this Final Order.

Dated: New York, New York
      August 3, 2012

                               */s/ Shelley C. Chapman*
                               Honorable Shelley C. Chapman
                               United States Bankruptcy Judge

<u>Exhibit A</u>

Security Agreement

[TO BE FILED SEPARATELY]